UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOUIS WILLIAMS,<br><br>                   Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>                  Defendant. | Case No.:  17CV226-AJB(JMA)<br><br>**REPORT & RECOMMENDATION** |

Plaintiff Louis Williams ("Plaintiff") seeks judicial review of Defendant Acting Social Security Commissioner Nancy A. Berryhill's ("Defendant") determination that he is not entitled to disability insurance benefits ("DIB").  The parties have filed cross-motions for summary judgment.  For the reasons set forth below, the Court recommends Plaintiff's motion for summary judgment be DENIED and Defendant's cross-motion for summary judgment be GRANTED.

## I.   BACKGROUND

Plaintiff was born on February 23, 1968.  (Admin. R. at 34.)  He completed "some college." (Id.) His last job was as a production floor laborer with Trendes Corporation. (Id.) He described that job as being "extreme physical work," which

included driving a truck, operating a fork lift, working a manufacture assembly line and heavy lifting (estimating the weight to be over 200 pounds). (Id. at 34-35. He last worked in 2009, when he was laid off. (Id. at 35.) He testified at the time, his employer had been trying to terminate him because his depression was negatively affecting his job performance. (Id.) He has not worked since that time. (Id. at 160.)

In his application for DIB, filed on August 1, 2012, Plaintiff alleged a disability onset date of August 1, 2009, due to depression, fibromyalgia, and chronic pain. (Id. at 143, 145.) Plaintiff's applications were denied initially on July 22, 2013, and upon reconsideration on December 3, 2013. (Id. at 86-90; 94-99.) On January 8, 2014, Plaintiff requested an administrative hearing. (Id. at 100-01.) A hearing was conducted on September 10, 2015, by Administrative Law Judge ("ALJ") Keith Dietterle, who determined on October 16, 2015, that Plaintiff was not disabled. (Id. at 11-25.) Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review on December 2, 2016. (Id. at 1-5.) Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

## II.   MEDICAL EVIDENCE

## A.   Treating Physicians

The medical evidence establishes Plaintiff received ongoing and regular treatment for depression and chronic back pain from locations from 2011 through 2015 at the Family Health Centers of San Diego's Chase Avenue and Logan Heights locations. Treatment notes of a visit he made on December 9, 2011 indicate he had a several year history of back pain and "muscle spasms" diffusely, including arms and legs. (Id. at 249-250.) The pain in his lower back, with radiation to shoulders, was estimated to be a 7-10 on a scale of 1-10. With medication, he reported the pain improved to a 3-4 out of 10.  Plaintiff used

/ /

Tylenol, Ibuprofen, Flexiril and, about once a week when the pain was severe, Percocet. (Id.) He also took Prozac once a day for depression. (Id.)

On May 10, 2012, Plaintiff was seen by Kelly Hagerich, M.D. at the Chase Avenue facility. (Id. at 316-317.) The purpose of his visit was to request medication refills because he had lost all his medication in a house fire and to request a disability form be completed. Dr. Hagerich observed he should have run out of medication much earlier. When asked, Plaintiff was "not able to provide a clear reason as to why he thinks he is disabled, besides 'back spasms.'" Plaintiff then became angry when Dr. Hagerich told him that she did not have "enough information to fill out his disability form" and scheduled an appointment with Christopher J. Gordon, M.D., a physician with the Chase Ave. facility who treated Plaintiff on a regular basis, for the next day. (Id.)

When Dr. Gordon saw Plaintiff on May 11, 2012, Plaintiff again reported back pain in his lower back with radiation to his upper back and neck, and in the past five years, also radiating to both arms. (Id. at 245-248 and 372-374.) Plaintiff reported that repetitive activities and "gripping" worsened his symptoms and described the pain as an 8 of 10 without medication and as a 4 with medication. He coped with the pain on a daily basis, but only took Percocet once every 2 weeks. He continued to take Prozac for depression, but reported his energy was low. Dr. Gordon noted during the physical exam Plaintiff displayed full motor and sensory abilities with no evidence of loss of sensation, weakness, or other problem in any extremity or spinal area. (Id.)

The following month, Plaintiff was seen by Dr. Gordon again, at which time he requested to be tested for fibromyalgia. (Id. at 242-244.) He reported "sharp pain" on an intermittent basis in his lower back that was exacerbated by kneeling down and reaching. He also complained of muscle spasms and numbness in his upper arms and said his symptoms had worsened. He reported that Percocet helped, but said he only took it when the pain was exacerbated. He had not

taken Baclofen. He had started a physical therapy regimen and asked if going to the gym would create an issue with his application for disability benefits. His physical exam showed that he had full strength in all of his extremities. (Id.)

During 2012, Dr. Gordon twice referred Plaintiff for imaging, including x-rays and MRIs, of his thoracic and cervical spine. (Id. at 400-404.) The x-rays showed mild multilevel degenerative disc disease in the thoracolumbar junction and upper lumbar spine at Ll-L2. (Id. at 403-404.) The MRI of his cervical spine indicated Plaintiff had straightening of the normal cervical lordosis with multilevel cervical spondylosis, but no central spinal stenosis. Probable impingement of multiple exiting nerve roots was detected, as well as a large syrinx within the cervical spinal cord at the T1 and T2 levels. (Id.) The MRI of his thoracic spine showed a broad-based disc bulge at T3-T4 with mild spondylosis. (Id. at 400-402.)

When Dr. Gordon saw Plaintiff on September 18, 2012, Plaintiff rated his chronic mid and upper back pain as a 7-8 out of 10 and reported that nothing alleviated it. (Id. 303-305.) He also reported that when his back spasmed, he experienced numbness and weakness in one or the other arm, lasting 5 minutes. He had stopped attending physical therapy because "depression symptoms kicked in, (and he) had no motivation to go." The physical exam showed tenderness to palpation to the upper thoracic paraspinal muscles on the right side and that Plaintiff retained full strength in all upper extremities including flexion, extension, and grip. (Id.)

On September 27, 2012, Camellia Clark, M.D. saw Plaintiff for a follow up mental status exam. (Id. at 361-362.) At that time he reported he had not filled his Trazodone prescription (for sleep) due to the expense. He reported he was tired, was still in "lots of pain" and was angry about the inadequacies of social services, including medical coverage. Dr. Clark explained that Plaintiff's tiredness was unlikely to improve without quality sleep and encouraged him to take the

Trazodone. She observed Plaintiff was cooperative with a good thought process and appropriate judgment and insight. He had fair attention and concentration with an irritable and depressed mood and showed normal thought content with no suicidal or homicidal ideations and no auditory or visual hallucinations. (Id.)

On November 8, 2012, Plaintiff was assessed by Licensed Clinical Social Worker Charissa Ruud, of the Chase Avenue facility, for moderate depressive disorder. (Id. at 264-268.) He reported he had experienced depression symptoms since his 20s. He suffered from domestic violence, child abuse and sexual abuse as a child and had recently seen his house burn down, along with all his possessions. LCSW Ruud noted Plaintiff had a depressed mood most days, anhedonia, weight loss of 10-15 pounds without effort, sleep difficulties, fatigue, low energy, psychomotor retardation, feelings of guilt and low self-esteem, diminished concentration, and difficulty managing his anger.  He reported that day his pain was a 5 to 8 out of 10. He was taking Prozac and Gabapentin, but still had not filled the Trazodone prescription. (Id.)

Plaintiff's mental status exam showed that he was well orientated and had normal thought process and thought content. (Id. at 267.) Ruud noted he had an average intellect with a depressed mood and an inability to concentrate, and demonstrated age appropriate judgment and insight. (Id.) When asked to identify his strengths, Plaintiff responded he was "personable, analytical and a thinker." (Id. at 268.)

On March 4, 2013, Plaintiff again underwent MRIs of his thoracic and cervical spine which showed little interval change and documented extensive syringohydromyelia extending from approximately the C7-T1 level to the T6-T7 levels. The MRI of the cervical spine showed little interval change, large cervicothoracic syrinx, multilevel mild spondylosis, no central canal stenosis, and multilevel uncovertebral arthrosis and facet arthropathy with multilevel foraminal stenosis distribution. (Id. at 285-288.)

Thereafter, he was referred by Dr. Gordon to neurosurgeon Tyrone Hardy, M.D., who reviewed the MRI results and then saw Plaintiff on April 11, 2013. (Id. at 280-284.) Plaintiff reported to Dr. Hardy that he had seen a number of physicians in the past and on many occasions his symptoms were dismissed, possibly as psychosomatic. He complained of some intermittent difficulty with walking, but reported his symptoms were mainly located in his hands and arms, were greater on the left side than the right, and were slowly worsening. At this time he was taking Oxycodone for pain management. Dr. Hardy performed a motor and sensory examination of Plaintiff's upper extremities that showed some minimal weakness of pronation and sublimation bilaterally of the hands, but otherwise Plaintiff had full motor and sensory abilities with no evidence of loss of sensation, weakness, or other problem in any extremity or spinal area. (Id.)

Dr. Hardy's assessment of Plaintiff was that he primarily had a pain syndrome intermittently with some tingling dysesthesias and Lhermitte-type phenomenon as a result of syringomyelia of the cervical thoracic spinal cord. He informed Plaintiff the treatment approach would be a drainage-type of procedure which carries "significant risk and poor long-term prognosis." He advised Plaintiff to defer having any surgical intervention and be treated symptomatically for his pain problem with regular visits. Plaintiff was also cautioned to limit any kind of traumatic activity that could worsen his condition. (Id. at 282.)

When he next saw Dr. Gordon, on June 18, 2013, Plaintiff rated his pain at an 8 to 9 out of 10, and explained he had decided to wait on surgery due to Dr. Hardy's prognosis. (Id. at 295-296; 351-352.) He had not filled the prescription for Gabapentin and asked for an Oxycodone prescription, which he had received during a recent hospitalization and he said "made him feel rest." (Id.)

Plaintiff was seen by Dr. Gordon twice more that year. During both visits he reported his pain had worsened to a 10 without medication, and improved to a 5-7 of 10 with medication (Vicodin) or on a good day. (Id. at 338, 348.) He reported

17CV226-AJB(JMA)

he tried taking Gabapentin, but stopped because it elevated his heart rate. (Id. at 348.) He reported his pain affected his ability to perform both active and inactive daily living activities, but with medication he was able to get a good night of rest and be more mobile during the day. (Id. at 338, 348.) He also reported he was taking steps to obtain a disabled person placard from the DMV. (Id. at 338)

On November 8, 2013, Joe Sepulveda, M.D. conducted a psychiatric evaluation of Plaintiff. (Id. at 341-343.) Plaintiff informed Dr. Sepulveda that medications he had tried in the past had not completely resolved his symptoms of depression. He reported experiencing anhedonia, hypersomnia, poor concentration, lack of pleasure, poor energy, and "chronic poorly controlled musculoskeletal and neuropathic pain." The mental status exam showed Plaintiff had appropriate judgment and insight with a good memory. It also showed he had an appropriate fund of general knowledge and appropriate attention span and ability to concentrate. (Id.)

Dr. Sepulveda linked Plaintiff's inability to obtain complete relief of his depressive symptoms through medication with his uncontrolled chronic pain, opining "given chronic poorly controlled pain it is very likely that despite psychotropic interventions that [Plaintiff] will continue to have residual symptoms of poor mood." (Id. at 343.) He increased Plaintiff's dosage of Prozac and strongly recommended Plaintiff undergo "ongoing therapy for depression and for development of relaxation and coping mechanisms for depressive symptoms due to chronic pain." (Id.)

In 2014, Plaintiff began receiving treatment at the Logan Heights Family Health Center because he was homeless and did not have transportation to get to the Chase Avenue location. (Id. at 426.) On June 4, 2014, he saw Tania Media, M.D. in order to refill his medications. He reported he had been out of his medication, including his pain medication, for a couple of months. He was not depressed and was observed to be "happy and comfortable," but he rated his

17CV226-AJB(JMA)

pain at a 9 out of 10. (Id.)  His prescriptions for his anti-depression and hypertension medications were refilled, but his prescription for the pain reliever Norco was not. (Id. at 427.)

On July 8, 2014, he followed up with Ebrahim Mohamedy M.D. for pain management and hypertension. (Id. at 424.) Plaintiff reported that Norco alone did not alleviate his back pain. He had visited a pain specialist, but refused to refill his prescription for pain medication. He rated his pain that day as a 6 of 10. (Id.)  When he returned to the Logan Heights facility on September 10, 2014, he indicated he didn't want to return to the Chase location because he had concerns about "how Dr. Gordon has been documenting [his] problems." (Id. at 419.)  He was referred for a pain management consultation. (Id. at 420.)

On November 12, 2014, Plaintiff returned to the Logan Heights facility, where he was seen by Tsuh-Yin Chen, M.D. (Id. at 416-418.)  Dr. Chen reported that Plaintiff demanded pain medication be dispensed to him immediately because he was in "a lot of pain." When Dr. Chen offered to refill his NSAIDS and explained that he needed to see the pain management specialist for pain medication, he began yelling "I need somebody who is competent and can give me my pain medicine!"  When Plaintiff refused to calm down, Dr. Chen requested the Associate Director join her in the exam room because she felt frightened by Plaintiff. The Associate Director then informed Plaintiff that Family Health Centers of San Diego could no longer treat Plaintiff for his pain because he had gone to outside providers for narcotics. Plaintiff denied going anywhere else, but indicated he understood he was being discharged from pain management at Family Health Centers of San Diego and requested a refill of NSAIDS while he was waiting to see the pain management specialist. (Id.)  Plaintiff continued to be seen at Family Health Centers of San Diego for his depression and other health issues.

/ /

17CV226-AJB(JMA)

**B.    Consultative State Agency Physician**

On July 10, 2013, at the request of Defendant, Mounir Soliman M.D. of Seagate Medical Group, prepared a summary report after conducting a psychological consultative examination of Plaintiff and reviewing records provided by Defendant. (Id. at 328-332.)  Dr. Soliman found Plaintiff to be pleasant and cooperative, groomed and appropriately dressed (Id. at 328.) Plaintiff informed Dr. Soliman that he was disabled due to "depression, pain." (Id.) Plaintiff reported his daily living activities included cooking his own meals, cleaning the house, shopping, and running errands, and that he was able to handle his own finances and personal hygiene (Id. at 330.)

Plaintiff reported he had difficulty concentrating, but had no problem getting along with family, friends, and neighbors. (Id.) His mental status exam showed that he had logical, coherent, and goal directed thoughts. He was well orientated but showed a poor memory and was unable to count by sevens. (Id.) He showed good abstract thinking and was able to interpret a proverb.  He also had good insight and judgment and had no looseness of associations. (Id. at 331.) His mood was depressed. (Id.)

Noting Plaintiff had a significant history of depression and back pain, Dr. Soliman opined "[f]rom a psychiatric standpoint, [Plaintiff] is able to understand, carry out, and remember simple and complex instructions. [Plaintiff] is able to interact with co-workers, supervisors, and the general public. [Plaintiff] is able to withstand the stress and pressures associated with an eight-hour workday, and day-to-day activities." (Id. at 332.) Dr. Soliman deferred evaluation of Plaintiff's physical condition to the appropriate specialty. (Id.)

**C.    Non-Examining State Agency Physicians**

State agency physicians Jo McClain, PsyD and Patricia Staehr, M.D. prepared a Disability Determination Explanation on July 18, 2013, at the initial level of review of Plaintiff's disability benefits application. (Id. at 52-65.) That

report was prepared after a review of Plaintiff's medical history and Dr. Soliman's findings, and concluded Plaintiff had a spinal disorder and an affective disorder that rated as severe impairments. (Id. at 58.) It was determined that Plaintiff did not meet the "A" or "C' criteria, meaning his depression did not precisely satisfy the diagnostic criteria. The evaluation concluded Plaintiff had no restrictions on activities of daily living, mild difficulty in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence or pace. No episodes of decompensation of an extended duration were noted. (Id.) Plaintiff was assessed to be "partially credible" with respect to his statements regarding his symptoms. (Id. at 59.) Specifically, the state agency physician remarked:

> The medical evidence shows that [Plaintiff] has received treatment for back pain.  However, his exams show him to have 5/5 strength throughout and he has full range of motion in his lumbar spine. The medical evidence also shows that [Plaintiff] has been diagnosed with a depressive disorder and has received treatment for this condition. At an exam in 7/2013, [Plaintiff] was noted to be unable to perform serial 7's and was only able to remember 1/3 objects after a period of time. He reports that he is able to cook, clean, shop, take care of personal hygiene items and financial responsibilities. [Plaintiff] is partially credible because the objective evidence does not fully support the limitations that are described by [Plaintiff].

(Id.) It was determined Plaintiff could occasionally lift and carry 20 pounds and frequently carry 10 pounds. (Id. at 59-60.) He could sit for six hours in an eight-hour workday and stand for six hours in an eight-hour workday. His limitations on pushing or pulling were the same as on the ability to lift and carry. He could frequently climb ramps and stairs and could occasionally climb ladders, ropes, or scaffolds. He could occasionally stoop and crawl with no limitations on balancing, kneeling, or crouching. (Id.) The state agency evaluation further concluded Plaintiff would have moderate limitations in remembering detailed instructions, / /

17CV226-AJB(JMA)

but would be capable of handling simple one and two-step instructions. (Id. at 62.)

State agency physicians V. Michelotti, M.D. and R. Paxton, M.D. reviewed Plaintiff's medical history and prepared an evaluation in the fall of 2013, at the reconsideration level of Plaintiff's application for disability benefits. (Id. at 67-81.) Plaintiff was found to have the same exertional limitations that were identified at the initial level, but his postural limitations were reduced to never climbing ladders, ropes, or scaffolds. The assessment of his abilities in all other areas, mental and physical, remained the same. (Id. at 73-79.)

## III. PLAINTIFF'S TESTIMONY

Plaintiff testified during the hearing before ALJ Dietterle. (Id. at 32-49.)  He completed high school and "some college." (Id. at 34.) His last job was as a production floor laborer with Trendes Corporation. (Id.) He described that job as being "extreme physical work," which included driving a truck, operating a fork lift, working a manufacture assembly line and heavy lifting (estimating the weight to be over 200 pounds). (Id. at 34-35.) He last worked in 2009, when he was laid off. (Id. at 35.) At the time, his employer had been trying to terminate him because his depression was negatively affecting his job performance. (Id.)

He testified he has been homeless since he was laid off. (Id. at 37.) He sleeps on other people's couches, uses an EBT card for groceries, and relies on public transportation. (Id. at 37-39.) He does not like being around others due to his depression. (Id.) He thinks the biggest impediment to him working again is having to be around people and lifting. (Id. at 44.)  He was fired from a number of jobs in the past, before he received his diagnosis. (Id. at 44-45.)

The ALJ inquired about the cane Plaintiff brought to the hearing. Plaintiff said it was not prescribed, but he uses it because his back occasionally "locks up," meaning it becomes tremendously painful and he is unable to move until the pain subsides on its own. (Id. at 40-41.)  He has opted for pain management over

17CV226-AJB(JMA)

surgery, due to the risk of paralysis associated with surgery. (Id. at 41-42.) He reported he was seeing a new physician, Dr. Steiner, who prescribes medication that helps him manage his back pain. (Id. at 41.) He also wears a splint on his right wrist and a knee brace because his "kneecaps are weakening up," and he sometimes will get a "nerve jolt" while walking that will cause him to collapse. (Id. at 48.)

With respect to his physical abilities, he stated he can sit or stand for 30 to 45 minutes at a time and can walk for less than a half mile. (Id. at 42.) He used to work out, but the pain made that unmanageable. (Id. at 44.)

He testified he had been taking Prozac for depression, but as of the prior week he started taking Mirtazapine at the advice of a new physician. (Id. at 36-37.) He reported the medications help make the depression manageable. (Id. at 44.) He has difficulty concentrating and is forgetful. (Id. at 46.)

## IV.    THE ALJ DECISION

After considering the record, ALJ Dietterle made the following findings:

. . . .

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 1, 2009 through his date last insured of March 31, 2014. [citations omitted].

. . . .

3.    Through the date last insured, the claimant had the following severe impairments:  thoracic spondylosis; cerviclgia; degenerative disc disease of the lumbar spine; depressive disorder without psychosis; and chronic pain syndrome [citation omitted].

. . . .

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in [the Social Security regulations].

17CV226-AJB(JMA)

. . . .

5.     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R 404.1567(b) except the claimant is limited to frequently climbing ramps but can never climb ladders, ropes, or scaffolds. He can frequently balance, kneel, and crouch. He can occasionally stoop and crawl. He can have no exposure to unprotected heights or dangerous moving machinery. He is also limited to simple one and two step instruction.

. . . .

6.     Through the date last insured, the claimant was unable to perform any past relevant work [citation omitted].

. . . .

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed [citations omitted].

. . . .

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from August 1, 2009, the alleged onset date, through March 31, 2014, the date last insured. [citations omitted].

(Id. at 13-25.)

## V.     STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show: (1) he or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously

performed or any other substantially gainful employment that exists in the national economy. <u>See</u> 42 U.S.C. § 423(d)(1)(A), (2)(A). An applicant must meet both requirements to be "disabled." <u>Id.</u> Further, the applicant bears the burden of proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired. <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995).

## A.    Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are as follows: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled.  If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work he has done in the past. If so, the claimant is not disabled.  If not, the evaluation continues to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy the claimant can do, the claimant is not disabled. 20 C.F.R. § 404.1520; <u>see</u> also <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

## B.    Judicial Review

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless: (1) The ALJ's findings are based on legal error or (2) are not supported by

17CV226-AJB(JMA)

substantial evidence in the record as a whole. <u>Schneider v. Comm'r Soc. Sec.</u>
<u>Admin.</u>, 223 F.3d 968, 973 (9th Cir. 2000); <u>Garrison v. Colvin</u>, 759 F.3d 995,
1009 (9th Cir. 2014). Substantial evidence means "more than a mere scintilla but
less than a preponderance; it is such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." <u>Andrews v. Shalala</u>, 53 F.3d
1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole,
weighing both the evidence that supports and detracts from the Commissioner's
conclusion. <u>See</u> <u>Mayes v. Massanari</u>, 276 F.3d 453, 459 (9th Cir. 2001);
<u>Desrosiers v. Sec'y of Health & Human Servs.</u>, 846 F.2d 573, 576 (9th Cir. 1988).
"The ALJ is responsible for determining credibility, resolving conflicts in medical
testimony, and for resolving ambiguities." <u>Vasquez v. Astrue</u>, 572 F.3d 586, 591
(9th Cir. 2009) (citing <u>Andrews</u>, 53 F.3d at 1039). Where the evidence is
susceptible to more than one rational interpretation, the ALJ's decision must be
affirmed. <u>Id.</u> at 591 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying,
or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g). The matter may
also be remanded to the SSA for further proceedings. <u>Id.</u>

## VI. DISCUSSION

Plaintiff contends the ALJ committed error by failing to articulate sufficient
reasons for discrediting his symptom testimony and finding him partially credible.
(Pl.'s Mem. at 5-12.) In determining a claimant's residual functional capacity at
steps four and five of the sequential evaluation process, the ALJ must consider
all relevant evidence in the record, including medical records, lay evidence, and
"the effects of symptoms, including pain, that are reasonably attributed to a
medically determinable impairment." <u>See</u> <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d
880, 883 (9th Cir. 2006) (citing SSR 96-8p, 1996 WL 374184, at *5). "Careful
consideration must be given to any available information about symptoms
because subjective descriptions may indicate more severe limitations or

17CV226-AJB(JMA)

restrictions than can be shown by objective medical evidence alone." SSR 96-8p, 1996 WL 374184, at *5; <u>see</u> <u>also</u> 20 C.F.R. § 404.1529(c)(3). When considering a claimant's subjective symptom testimony, "if the record establishes the existence of a medically determinable impairment that could reasonably give rise to the reported symptoms, an ALJ must make a finding as to the credibility of the claimant's statements about the symptoms and their functional effect." <u>Robbins</u>, 466 F.3d at 883 (citing SSR 96-7p, 1996 WL 374186, at *1). "While an ALJ may find testimony not credible in part or in whole, he or she may not disregard it solely because it is not substantiated affirmatively by objective evidence." <u>Id.</u> Rather, unless the ALJ makes a finding of malingering, an ALJ may only find a claimant not credible by making specific findings as to credibility and stating clear and convincing reasons to discount the claimant's subjective symptom testimony. <u>Id.</u>; <u>see</u> <u>also</u> <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1036 (9th Cir. 2007); <u>Garrison</u>, 759 F.3d at 1014-15.

The ALJ stated that he found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms not entirely credible for the following reasons: 1) Plaintiff's allegations of disability were not fully supported by the treatment record; 2) he was noncompliant with prescribed medication and combative with his medical providers; and 3) he made inconsistent statements regarding his symptoms. (Admin. R. 21-22.)

## A.    The Record Supports the ALJ's Determination that Plaintiff's Allegations of Disability were not Fully Supported

With respect to the ALJ's first stated reason for finding Plaintiff to be partially credible, although an ALJ may not disregard a claimant's testimony "*solely* because it is not substantiated affirmatively by objective medical evidence." <u>See</u> <u>Robbins</u>, 466 F.3d at 883 [emphasis added]), the ALJ may consider whether the alleged symptoms are consistent with the medical evidence as one factor in his evaluation. <u>See</u> <u>Lingenfelter</u>, 504 F.3d at 1040; <u>see</u> <u>also</u>

17CV226-AJB(JMA)

<u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis.")

When evaluating Plaintiff's complaints of pain and back spasms, the ALJ considered that during multiple examinations by his treating physicians, Plaintiff demonstrated full strength in all his extremities, no atrophy, and no evidence of loss of sensation, weakness, or other problem in any extremity or spinal area. (<u>Id.</u> at 19-20, citing Admin. R. 239, 242, 245, 282.) For example, the ALJ observed that on May 11, 2012, Dr. Gordon conducted a physical exam that showed no joint swelling or atrophy and full strength in all his extremities. (<u>Id.</u> at 20, 245.) On June 18, 2012, Dr. Gordon observed Plaintiff had full strength in all of his extremities and noted Plaintiff's x-rays showed mild multilevel degenerative disc disease in the thoracolumbar junction and upper lumbar spine at Ll-L2, and that his subsequent physical exam showed that he had full strength in all of his extremities. (<u>Id.</u> at 20, 242.) Then, at his next exam on September 18, 2012, Dr. Gordon indicated Plaintiff showed tenderness to palpation to the upper thoracic paraspinal muscles on the right side, but that he retained full strength in all upper extremities including flexion, extension, and grip. (<u>Id.</u> at 20, 239.) The ALJ also observed that the following spring, when Dr. Hardy assessed Plaintiff, Plaintiff had full motor and sensory abilities with no evidence of loss of sensation, weakness, or other problem in any extremity or spinal area. (<u>Id.</u> at 20, 282.)

Likewise, when evaluating the effects of Plaintiff's depression, the ALJ considered the fact that Plaintiff's treating mental health providers' treatment notes also indicated relatively normal clinical findings. (<u>Id.</u> at 18-19.) Specifically, the ALJ noted Dr. Clark found Plaintiff to be cooperative with a good thought process and appropriate judgment and insight, fair attention and concentration, normal thought content, and without hallucinations, when she examined him on September 27, 2012. (<u>Id.</u> at 18, 361.) LCSW Ruud's notes from the mental health

17CV226-AJB(JMA)

assessment she conducted on November 8, 2012, indicate Plaintiff was unable to concentrate, but was well-orientated, cooperative, had a normal thought process and thought content, and average intellect. (Id. at 19, 267.) On August 26, 2013, Dr. Gordon noted Plaintiff did not display any symptoms of depression or psychomotor agitation. (Id. at 19, 348.) Later that year, on November 8, 2013, Plaintiff was seen by Dr. Sepulveda, who found Plaintiff had appropriate judgment and insight with a good memory, appropriate fund of general knowledge, and appropriate attention span and ability to concentrate. (Id. at 19, 342.) Furthermore, the state agency physician's notes from his examination of Plaintiff are consistent with the observations of Plaintiff's treating physicians. Dr. Soliman found Plaintiff to be pleasant, cooperative and appropriately dressed and determined that Plaintiff had a poor memory, but logical, coherent, and goal-directed thoughts, was well-orientated, and had good insight and judgment. (Id. at 19, 328, 330-31.)

Given the observations of multiple treating professionals, as summarized above and as corroborated by Dr. Soliman, the ALJ's determination the medical record does not support Plaintiff's allegations of disability is a clear and convincing reason the ALJ could properly use as a factor in discounting Plaintiff's subjective symptom testimony. Robbins, 466 F.3d at 883.

**B.     The Record Supports the ALJ's Determination that Plaintiff was not Compliant with his Medications**

The ALJ also stated he found Plaintiff's subjective symptom testimony to be partially credible because Plaintiff was not compliant in taking prescribed medication and was combative with medical providers. (Id. at 19-20, 21.) It is unclear how Plaintiff's combativeness would be a determining factor for purposes of his credibility, but an ALJ may certainly consider the effectiveness of medication a claimant has taken when considering the severity and limiting effects of an impairment. See 20 C.F.R. § 404.1529(c)(4)(iv). Medical

17CV226-AJB(JMA)

improvement from treatment supports an adverse inference as to the credibility of a claim of ongoing disability. See Morgan v. Comm'r of Soc. Sec., 169 F.3d 595, 599 (9th Cir. 1999); See also 20 C.F.R. § 404.1530(a), (b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled"). The record is replete with instances where Plaintiff reported medication improved his pain significantly. [see e.g. Admin. R. at 242 (reported "Percocet helps"); Id. at 245 (pain decreased with medications from 8/10 to 4/10); Id. at 249 (pain decreased with medications from 7-10/10 to 3-4/10); Id. at 315 (pain decreased with medications from 8/10 to 4/10); and Id. at 348 (pain decreased with medications from 10/10 to 5-7/10)]. Plaintiff also reported to Dr. Gordon that his goal of 50% improvement in pain had been met. (Id. at 349); See Warre v. Comm'r of Soc. Sec., 439 F.3d 1001, 1006 (9th Cir. 2006) ("[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of considering eligibility for SSI benefits.").

Nonetheless, despite the fact the medication offered him pain relief, Plaintiff frequently did not take it, or took it less often than prescribed. The record indicates Plaintiff generally took pain management medication about once or twice a week, which Plaintiff argues is not indicative of a pattern of non-compliance, but rather is consistent with his doctor's orders to take the medication "as needed." (Pl. Mem. at 8.) The record, however, contains evidence indicating Plaintiff did not take his medications "as needed" or as prescribed, as observed by several of his treating physicians. For example, the ALJ noted that when Dr. Hagerich saw Plaintiff on May 10, 2012, she observed, and Plaintiff confirmed, he had run out of medication well before that date. (Admin. R. at 19, 316). Concerns about Plaintiff's failure to take his pain medication were also raised by Dr. Sepulveda, who opined that Plaintiff's "uncontrolled chronic pain" was linked to his inability to obtain complete relief of his depressive symptoms through medication. (Id. at 343.) When she saw Plaintiff on June 4, 2014, Dr.

Media noted Plaintiff had been out of all his medications, including pain medication, for a couple of months. (Id. at 426.)

Moreover, Plaintiff was non-compliant with taking other medications. When he saw Dr. Clark on September 27, 2012, he reported he had not filled his prescription for Trazodone and that he was tired and in "lots of pain." (Id. at 361.) She explained that his tiredness was unlikely to improve without quality sleep and encouraged him to take the prescription; however, when he saw LCSW Ruud a few weeks later, on November 8, 2012, he still had not filled the prescription. (Id. at 361, 266.) He also reported to Dr. Gordon that he had not filled a prescription for Bacoflen. (Id. at 242.)

Given the observations by Plaintiff's treating physicians, and looking at the record as a whole, the ALJ's conclusion that Plaintiff was non-compliant with taking medication is rational. Where, as is the case here, evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. Vasquez, 572 F.3d at 591 (citing Andrews, 53 F.3d at 1039). The ALJ's determination that Plaintiff was non-compliant with his use of prescribed medication is, therefore, a clear and convincing reason for discounting Plaintiff's subjective symptom testimony.

## C.     The Record Supports the ALJ's Determination that Plaintiff Made Inconsistent Statements Regarding His Symptoms

The third reason articulated by the ALJ as his basis for finding Plaintiff to be partially credible was that Plaintiff made inconsistent statements regarding his symptoms. (Admin. R. 16, 19, 21-22). Inconsistent statements and testimony can bear upon a claimant's credibility. See, e.g., Verduzco v. Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999); SSR 96-7p "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record;" See also Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) ("ALJ may consider inconsistencies either in the claimant's

testimony or between the testimony and the claimant's conduct"). Here, Plaintiff contends the ALJ failed to identify what the inconsistencies were; however, the ALJ specifically noted that Plaintiff's reporting to the State agency, which the ALJ reviewed in his discussion of the "B" criteria at step three of the sequential analysis, was "vastly different than what he reported during his consultative examination." (Admin. R. at 16, 21-22.) As the ALJ explained, Plaintiff reported to the State agency that he needed to sleep or lie down all day, did not spend time with others, and was not able to get along with authority figures. (Id. at 16, 188, 191-93.) In comparison, the ALJ considered that Plaintiff reported to Dr. Soliman his daily activities included a variety of activities, including cooking his own meals, cleaning the house, shopping, and running errands. (Id. at 19, 330.) The ALJ also considered that Plaintiff told Dr. Soliman that he lives with friends from one place to another and he had no problem getting along with family, friends, and neighbors (Id.)

Plaintiff contends his statements about getting along well with others and wanting to be isolated are not inconsistent.[1] [2] (Pl. Mem. at 10.)  As addressed above, Plaintiff's description of his sociability was only one of several inconsistencies the ALJ identified. The ALJ also observed that Plaintiff reported to the State agency that he needed to sleep or lie down all day, whereas he

---

[1]  Plaintiff takes issue with Dr. Soliman's report because it incorrectly identities that Plaintiff completed his college education. (Pl.'s Mem. at 10.) Regardless of the reason for the incorrect reporting, it is inconsequential because the ALJ did not rely on Plaintiff's completion of college as a basis for rejecting his subjective complaints. Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (an error is harmless when "it is clear from the record that the . . . error was inconsequential to the ultimate nondisability determination").

[2]  Plaintiff also contends the ALJ improperly considered that Plaintiff worked out at the gym. (Pl. Mem. at 6-7.)  When summarizing Plaintiff's medical history, the ALJ noted that Plaintiff reported to Dr. Gordon he exercised at the gym; however, the ALJ did not identify this statement as being an inconsistency or a reason for discounting Plaintiff's credibility. (Admin. R. at 20.)

17CV226-AJB(JMA)

reported to Dr. Soliman that he partook in a variety of activities on a daily basis, such as cooking, housekeeping, shopping and running errands. (Id. at 16, 19, 188, 191-93, 330).

Moreover, when questioned by the ALJ at the hearing, Plaintiff testified that having to be around people was one of his biggest impediments to returning to work. (Id. at 44.) To the extent the evidence regarding Plaintiff's social functioning and daily activities is open to more than one interpretation, the Court must defer to the ALJ's interpretation, which was rational in consideration of the record as a whole. The ALJ's determination that Plaintiff made inconsistent statements to the State agency and consultative examiner is, therefore, a clear and convincing reason for discounting Plaintiff's subjective symptom testimony.

## VII. CONCLUSION

In sum, an ALJ's assessment of pain severity and claimant credibility is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989). The Court concludes the ALJ articulated sufficient clear and convincing reasons supported by substantial evidence to discount Plaintiff's subjective pain testimony.

For the reasons set forth above, the Court recommends Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

This report and recommendation will be submitted to the Honorable Anthony J. Battaglia, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **February 16, 2018**. The document should be captioned "Objections to Report and Recommendation." Any reply to the Objections shall be served and filed on or before **February 23, 2018**. The parties are advised that failure to file objections / /

17CV226-AJB(JMA)

within the specified time may waive the right to appeal the district court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 1, 2018

_____
Honorable Jan M. Adler
United States Magistrate Judge

17CV226-AJB(JMA)